UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
AUGUSTA MALACARNE,

                                         Index No.:

              Plaintiff,

        -against-

                                 **COMPLAINT**

CITY UNIVERSITY OF NEW YORK,
PAUL RUSSO, AND ROBERT SPECTER,
VICE PRESIDENT OF ADMINISTRATION
AND FINANCE, BARUCH COLLEGE

              Defendants.           JURY TRIAL DEMANDED
----------------------------------------------------x

        Augusta Malacarne, by her Attorneys, OFODILE & ASSOCIATES, P.C., complaining of

the defendants, the City University of New York, Paul Russo, and Robert Specter, Vice President

of Administration and Finance of Baruch College,  upon information and belief, alleges as

follows.

        1.     This action is brought to remedy discrimination in employment and retaliation for

complaining about discriminatory terms, conditions, and privileges of employment on the basis

of sex, pursuant to Title VII of Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.,

the Equal Pay Act,  29 U.S.C. § 206(d)(1), the New York State Executive Law (Human Rights

Law § 296) and the Administrative Code of the City of New York, §§ 8-107.1(a) et seq.  This

action is also brought to remedy the retaliatory actions taken against Plaintiff for complaining

about what she honestly believed to be corruption and mismanagement at Baruch College of

CUNY and requesting that corrective actions be taken to remedy them in violation of her right to

freedom of expression protected by the First Amendment to the Constitution of the United States

which applies to States through the Fourteenth Amendment.

2.      Plaintiff seeks injunctive and declaratory relief, compensatory and other legal and

equitable relief pursuant to Title VII, the Equal Pay Act, 42 U.S.C. § 1983, the New York State

Human Rights Law and the New York City Administrative Code.

## JURISDICTION AND VENUE

3.      Jurisdiction is specifically conferred on the United States District Court by the

aforementioned statutes as well as by 28 U.S.C. §§ 1331, 1343 and 1983.  The Court has

supplemental jurisdiction over Plaintiff's claims based on the New York State Executive Law

§ 296 (Human Rights Law) and the New York City Administrative Code.

4.      The events, parties, transactions and injuries that form the basis of Plaintiff's

federal claims are identical to the events, parties, transactions and injuries that form the basis of

Plaintiff's claim brought under New York Human Rights Law, § 296 (Executive Law) and New

York City Administrative Code.

5.      The unlawful employment practices alleged in this complaint were committed in

the Eastern District of New York and venue is proper in this District pursuant to 28 U.S.C. §§

1391 (b) and ©).

## PARTIES

6.      At all times relevant and material to this case, Plaintiff Augusta Malacarne was a

Higher Education Associate and an Associate Director of Continuing and Professional Education

("CAPS") at Baruch College of the City University of New York, located at One Benard Baruch

Way, B1-116 New York, New York 10010.


7.      At all times relevant and material to this case, Defendant Paul Russo held

different positions at Baruch College, including, but not limited to Acting Director of IT

Programs in the Division of Continuing Education, Associate Director of CAPS and Acting Dean

of CAPS.


8.      At all times relevant and material to this case, Robert Specter was Vice President

of Administration and Finance at Baruch College to whom CAPS reported and who was

responsible for some of the discriminatory and retaliatory actions complained of in this case.


9.      The City University of New York (CUNY) was and still is a legal entity organized

under the laws of the State of New York and the City of New York and is an employer within the

meaning of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000-e et seq., the

Equal Pay Act, the New York State Human Rights Law and the New York City Administrative

Code.

## FULFILMENT OF ADMINISTRATIVE PROCEDURES

10.     Plaintiff Augusta Malacarne (also referred to as the Plaintiff)  has satisfied all administrative and judicial prerequisites to the institution of this action.

11.     Plaintiff timely filed a charge of discrimination against CUNY with the Equal Employment Opportunity Commission (EEOC) within three hundred days of some of the acts of sexual harassment and retaliation complained of herein, in accordance with the requirements of the Civil Rights Act of 1964, as amended.

12.     Plaintiff received a "Notice of Right to Sue" (annexed hereto) dated September 21, 2005 and this action is filed within ninety days of the receipt of the Notice of Right to Sue. Prior to the commencement of this action, the EEOC had not filed any action nor had it entered into any conciliation agreement regarding the allegations in this Complaint.

13.     Before the institution of this action, Plaintiff served a copy of this Complaint on the City Corporation Counsel's Office as well as on the New York City Commission on Human Rights on October 25, 2005, in accordance with the requirements of the New York City Administrative Code § 8-502© ).

## FACTUAL ALLEGATIONS

14.     Plaintiff Augusta Malacarne, a female, started her employment in 1992 as a member of the Continuing Studies Faculty in the Department of Rassias ® Method Language

-4-

Programs at Baruch College, City University of New York.

15.     In 1995, Ms. Malacarne became a full-time faculty member teaching Italian, French, and English as a Second Language.  She also received, from Dartmouth College in New Hampshire, a certificate in Rassias Method, a theater-based, interactive approach to language teaching.

16.     In 1997/98, Ms. Malacarne was promoted to Acting Director of Rassias Method Language Programs, and in 1998, she was selected as permanent Director of Rassias Method Language Programs after a national search.

17.     The position of Director of the Rassias Language Program entailed the administrative and academic direction of the English as a Second Language program, Modern Language and Teacher Training programs, involving revenues of 1.7 million dollars each year, and the supervision of eleven administrative staff and sixty part-time faculty members.  The position at that time paid $39,000.00 annually and conformed to the evaluation and compensation procedures of the collective bargaining agreement between the PSC/CUNY and CUNY.

18.     In 1999, Defendant Paul Russo arrived at Baruch College, enrolled in an Information Technology non-credit certificate program and became a part-time assistant to the lab technician in charge of turning on computers for the night classes.

19.     Also in 1999, due to the sudden resignation of the Director of IT (Information Technology) Programs who was selected a few months earlier after a national search, Mr. Russo was appointed Acting Director of IT programs in the Division of Continuing Studies and the position entailed the administrative and academic direction of the IT Programs, generating $600,000.00 a year in revenue, with a faculty of 25 part-time instructors and 2 administrative staff.

20.     This position (Director of IT Programs), although awarded to Mr. Russo, was not properly advertised as required by Baruch College policies.  In addition, when Mr. Russo was appointed to that position, although it was an inferior position to Plaintiff's, Plaintiff found out much later that he (Mr. Russo) was paid 40% more in compensation than Plaintiff because he is male.  And in addition to that, unlike Plaintiff, he received a percentage of each registration recorded in the IT programs.

21.     Between 1999 and 2001, Ms. Malacarne's programs grew at an unprecedented rate, and by the Summer of 2001, was generating $4.2 million in revenues.  New programs were added and a core group of thirteen full-time instructors was formed.  Because of the success and scope the Rassias Method Language Programs achieved under the direction and management of Ms. Malacarne, and because of additional innovative programs she developed, it was renamed the International Center for Language and Cross-Cultural Communications.  As a consequence of the unprecedented growth, the Division of Continuing Studies was also renamed "Continuing and Professional Studies" (CAPS).

22.     In or about July 2001, Abraham Tawil was appointed the new Acting Dean of CAPS, and in 2002 was chosen as permanent Associate Dean of CAPS, after a national search.

23.     After the appointment of Abraham Tawil, a radical re-engineering of CAPS followed and Mr. Tawil appointed both Ms. Malacarne and Mr. Russo to the Executive Committee of which he was also a member.

24.     In or about January 2002, after the consideration of her added responsibilities and a successful performance evaluation of the previous five years, Ms. Malacarne was, upon the recommendation of Dean Tawil and the approval of the Baruch College Reclassification Committee, promoted to Higher Education Associate and became Associate Director of CAPS.

25.     Defendant Paul Russo was given the same title of Associate Director of CAPS by Dean Tawil without ever undergoing any scrutiny or official approval.

26.     During his entire employment at Baruch-CAPS, Paul Russo never underwent any type of search whether external or internal.  He never underwent any type of proper performance evaluation and yet he received a salary far greater than the salaries of women holding similar positions as well as the salary/compensation of Plaintiff Augusta Malacarne who held the same title of Associate Director of CAPS that Mr. Russo also held.

27.     After being appointed the Associate Director of CAPS and empowered by Dean

Tawil, Paul Russo employed an aggressive and retaliatory management style so that any complaints of improprieties, disagreements or expression of a different opinion were met with punitive reprisal which included termination.

28.     Between 2002 and 2003, as a result of Paul Russo's actions, including the constant and impromptu implementation of academic and administrative changes as well as what was then becoming a generally hostile work environment, staff morale at CAPS reached an all-time low.

29.     Between 2001 and 2003, Plaintiff, as a member of the Executive Committee observed and recorded serious financial improprieties, misuse of public funds, mismanagement and personnel discrimination perpetrated by Paul Russo and condoned by Dean Tawil.

30.     In January 2003, Ms. Malacarne addressed the decline of CAPS with Dean Tawil, addressed some of the financial improprieties and decisions detrimental to the growth and progress of CAPS both administratively and financially.  During this meeting, Plaintiff advised Dean Tawil that she in good faith could not support some of the financial and personnel decisions made by Paul Russo as she thought they were detrimental to staff morale and constituted inappropriate business practices.

31.     Starting in February 2003, shortly after expressing her views about the decline of CAPS and what she considered to be the causes, as well as airing what she saw as improprieties

-8-

relating to the use and misuse of CUNY's financial resources, Ms. Malacarne was excluded from major decisions involving CAPS and learned about those decisions after the fact.

32.     Even after being marginalized, Plaintiff devoted her time and efforts to the Language Programs, increasing course offerings and developing and adding programs, such as the Cross-Cultural Corporate training certificate program and her efforts were successful as her outreach produced favorable letters of endorsement from the New York State Attorney General Eliot Spitzer, former President Bill Clinton, and a collaboration offer extended to her by then Secretary of State Colin Powell.  Feature articles on the value of her programs to Baruch College and the New York community appeared in two Manhattan newspapers and at this point in her career, Ms. Malacarne felt the presence of a quantum leap in her career potential which she had nourished and developed over ten years of service to Baruch College.  However, Baruch College stopped marketing her programs and stopped supporting them leading to further decline and the actions and inactions of the Defendants systematically combined to destroy that potential along with her entire career.

33.     In or about March 2003, approximately 24 of 31 CAPS staff members wrote a letter to Dean Tawil protesting Paul Russo's aggressive and retaliatory management style.  Upon information and belief, contrary to the assurance given to staff that regular staff meetings would thereafter be held so that issues concerning CAPS could be freely discussed and that Paul Russo would not be given a copy of the letter, no regular staff meetings were held and Paul Russo was given the letter written by staff and within three months thereafter, about fifty percent of all those

who signed the letter had their contract/employment with Baruch College terminated and the remaining fifty percent were given added responsibilities and had to absorb duties of those who were terminated without any added remuneration, which constituted another form of retaliation against them.

34.     In May 2003, the signatories to the letter addressed and given to Dean Tawil complaining about the state of CAPS (financially and otherwise), sent another copy to Human Resources to be filed and requested help from Human Resources but nothing was done.

35.     In June 2004, Paul Russo formally resigned from CAPS.  Robert Specter, Vice President of Administration and Finance (herein after referred to "VP Specter" or "Mr. Specter") asked Mr. Russo to remain as Acting Dean of CAPS and wanted to promote Abraham Tawil to Acting Vice President of Human Resources.

36.     On June 9, 2004, Plaintiff met with VP Specter for more than one hour as she was concerned about the two promotions and she detailed specific incidents demonstrating financial mismanagement, theft of services, use of public space for private and personal gain, discrimination, hostile work environment and retaliation.

37.     Ms. Malacarne asked VP Specter why he had not even considered her for the position offered to Russo, since unlike Russo, she had a spotless record, excellent evaluations, seniority, good rapport with staff and had generated, unlike Tawil and Russo, twenty five million

dollars for the College.  VP Specter told Ms. Malacarne that Paul Russo was not going to get the

position of Acting Dean of CAPS "because he deserves it more than you do"; Ms. Malacarne

then asked VP Specter whether she was not considered for the position because she was a woman

and VP Specter responded that Malacarne was putting him "in an untenable position".  Plaintiff

then raised the issue of the Huron Consulting Group report of 2004 which had concluded that at

Baruch College, "there was no merit promotion system".


38.     Plaintiff wrote a letter VP Specter memorializing their meeting of June 9, 2004

which included her criticism of the qualifications of Dean Tawil and Paul Russo for the positions

they were being promoted to and the contents of the letter were disclosed by VP Specter to Tawil

and Russo and the disclosure exacerbated the serious hostility towards Plaintiff in her immediate

workplace.


39.     As Plaintiff was aware of a confidential consulting report which documented

serious abuse of power, resources, and mismanagement at Baruch College, and as Plaintiff was

then watching the same type of incidents detailed in the report (The Huron Report) and even

worse, take place in her department, Plaintiff met with the President of Baruch College Ned

Regan in June 2004 and expressed her concerns about what was going on at CAPS but received

no response.


40.     Also in June 2004, more than a dozen CAPS staff members wrote at least two

letters to VP Specter and Baruch College President Waldron protesting the two promotions,

citing mismanagement and improprieties at CAPS during Tawil's and Russo's administration.

41.     One CAPS Program Director privy to account disbursements met personally with VP Specter and cited instances of fraud on the part of Tawil's and Russo's administration and later documented his meeting with the VP in an e-mail and his request for a second meeting to enlighten VP Specter further was refused.

42.     CAPS faculty also wrote a letter in June 2004 to VP Specter protesting the promotions and sent a copy to then incoming President Kathleen Waldron and Vice Chancellor of Faculty and Staff Relations Malone and those letters were ignored.

43.     Plaintiff Augusta Malacarne also wrote letters in June 2004 to all executive leaders of Baruch College and CUNY, including Vice Chancellor Brenda Malone and seven CUNY Board of Trustee members outlining her concerns regarding the two promotions, the fact that proper procedures were not followed and no search was conducted before the individuals were chosen, and also outlined the improprieties (financial and otherwise) at the College which paralleled those in the Huron Report.

44.     The Huron Consulting Group Report concluded, among other things, that at Baruch College "performance measurement does not exist", "there is no culture of professionalism or excellence at Baruch or CUNY", "there is a lack of accountability for tasks performed", "there is insufficient budget tracking system" and that "the business school does not

operate like a business".  Ms. Malacarne initiated a 20-minute telephone conversation with

CUNY Chancellor Matthew Goldstein alerting him to a list of specific serious improprieties that

she felt urgently required correction, including the provision of Vertical Campus office space for

the use of a private company over a two-year period.  She advised the Chancellor of the large

number of her colleagues protesting the proposed promotions of Abraham Tawil and Paul Russo.

Chancellor Goldstein advised, "Do nothing.  I will take care of it".  Ms. Malacarne heard no

more from the Chancellor and did not perceive any corrective measures being initiated.


45.     On July 1, 2004, despite the protests and concerns expressed by management,

faculty and staff, Abraham Tawil was appointed Baruch's Acting Vice President of Human

Resources and Paul Russo Acting Associate Dean of CAPS.  When national searches for these

positions were eventually initiated, in part because of Ms. Malacarne's constructive criticisms,

both candidates were found unworthy of those positions.


46.     After these appointments, VP Specter, accompanied by John Dugan, Legal

Counsel to the President and Faculty and Staff Relations Representative, requested a meeting

with CAPS staff to "address their concerns", and only seven out of the twenty-five members

attended because of their frustration with how VP Specter "handled their concerns".


47.     VP Specter and John Dugan scheduled another meeting for July 22, 2004 with the

rest of the staff and Plaintiff was invited and during the meeting, the fourteen persons that

attended voiced their concerns about Abraham Tawil's and Paul Russo's lack of integrity,

business practices and improprieties they had witnessed at CAPS.  The meeting ended on a bad

note as VP Specter refused to address any of their concerns.  Ms. Malacarne had recommended in

writing to Vice Chancellor Malone that she or her representative should attend the July 22nd staff

meeting if she was interested in hearing the details of the allegations of serious improprieties at

Baruch College but she neither attended nor did she send a representative.


48.     In July 2004, VP Specter scheduled a meeting with Ms. Malacarne to be attended

by John Dugan, Legal Counsel to the President.  Struck by the presence of legal counsel in a

meeting described as a "conversation", Plaintiff advised VP Specter that she intended to attend

the meeting accompanied by her own legal counsel.  Prior to the meeting, John Dugan

telephoned and advised Plaintiff that it would be "counter-productive" if she brought her own

legal counsel and when she inquired regarding why bringing her own counsel would be

counterproductive, she did not get any response.


49.     In August 2004, Acting Dean Russo scheduled a meeting with Malacarne in the

presence of John Dugan and believing that this meeting was not set up for her benefit or that of

CAPS, Plaintiff went to this meeting accompanied by her attorney and her Union Representative.

The meeting which was characterized by Paul Russo as an urgent review of the "illicit hiring of

an intern", was a formal meeting where everything said was documented.


50.     Paul Russo started the meeting by telling Ms. Malacarne that he had been told that

she accused him of crimes.  After Plaintiff's attorney spoke, the meeting ended and nothing was

discussed about the alleged illicit hiring of an intern and no follow-up meetings were scheduled although Defendant Russo soon afterwards removed the intern he had described as "illicit" from Ms. Malacarne's supervision and engaged that intern in one of his own projects and this intern to the best of Plaintiff's knowledge and information, is still on CUNY's payroll.

51.     Between August and December 2004, the morale at CAPS plummeted, Plaintiff was reduced to communicating by e-mail alone to most members of CAPS especially those carrying out Paul Russo's directive designed and intended to marginalize Plaintiff, sabotage her programs and ostracize her from normal verbal communications with CAPS personnel.

52.     Also between August and December 2004, key personnel under the direct supervision of Ms. Malacarne were removed from her supervision without prior notice or explanation, no marketing was done for the International Programs that she was responsible for and a key program, the Cross-Cultural Training program was intentionally and completely ignored even after marketing commitments were made and agreed upon.

53.     Plaintiff sent many e-mails to Acting Dean Paul Russo and also sent many e-mails to Baruch's President and CUNY Vice Chancellor of Faculty and Staff Relations making suggestions on how the department could be improved and she also sent e-mails to CAPS Marketing Director and Academic Director, and most of her e-mails were ignored.

54.     Starting in June 2004, in her e-mails, Plaintiff warned that lack of attention to

and marketing of her CAPS programs would doom the department, and within two months,

enrollment had dropped by fifty percent, and open houses and workshops had to be canceled,

seriously compromising international research projects and CAPS' academic collaborations

abroad.  Soon after, the Rassias Foundation, with whom Plaintiff had excellent relations, was

forced to advise Baruch's President Waldron that, because of the negligence of the Acting Dean

Paul Russo, the Foundation was prepared to sue Baruch College for breach of contract.  The

President immediately signed a check to the Rassias Foundation for $64,000.00 as compensation.


55.     Between August and December 2004, Ms. Malacarne had four short meetings

with Acting Dean Paul Russo and during each meeting, Plaintiff brought up issues relating to

personnel mistreatment, misappropriation of funds and discrimination and requested that they be

addressed so that morale and productivity within CAPS would be boosted but each meeting

ended by Plaintiff being yelled at and dismissed from Acting Dean Russo's office with "Get

out!".


56.     In CAPS, annual evaluation of employees takes place in February of every year

but in the middle of November 2004, after he had been Acting Dean for only four months,

Plaintiff was asked to meet with Paul Russo for her annual evaluation.  Plaintiff refused to meet

with Mr. Russo in person for the evaluation because her Contract gave her that option and she

did not want to meet for her evaluation unaccompanied by her attorney, with Mr. Dugan and Paul

Russo alone as she felt it would be a trap and subject to historical revision by them.

57.     On December 6, 2004, Acting Dean Paul Russo delivered to Plaintiff's office a written unsatisfactory evaluation.

58.     It was subsequently revealed that, against Baruch College policy, CUNY Deputy Counsel Jane Sovern had collaborated from CUNY Headquarters to construct the poor evaluation signed by Acting Dean Paul Russo.  A number of communications between Ms. Sovern and Mr. Russo regarding what should be contained in the evaluation and how to put them were seen and reviewed by Plaintiff and PSC CUNY Grievance Counselors in April 2005.  Baruch's Counsel to the President, John Dugan, immediately removed these documents from Plaintiff's personnel file, refusing further access, invoking "lawyer-client privilege".

59.     Plaintiff made several verbal and written appeals to Baruch's Human Resources Department for assistance during the ten-day period following the delivery of Plaintiff's unsatisfactory evaluation to her on December 6, 2004.  Plaintiff believes that Human Resources' failure to come to her aid was due to the fact that Abraham Tawil was the Acting Vice President of Human Resources at the time and he was retaliating against her for voicing her concerns about him as well as about his close friend Paul Russo.

60.     On December 11, 2004, which was a Saturday, Plaintiff received a letter dated December 10, 2004 at her residence, signed by the Provost informing her that she was put on administrative leave, with pay, until the end of June 2005, and that the President had decided not to reappoint her for the 2005-2006 fiscal year.  Plaintiff was not reappointed which automatically

meant that her employment at Baruch College was terminated.

61.     While Plaintiff was away from her office, it was sealed, designated off limits to her, and the College for many months retained her records even after numerous promises to return them to her.  Her mail to the College was abruptly returned to sender, her office phone line was disconnected and persons requesting her at the College were told that Augusta Malacarne was no longer with Baruch College and the College had no forwarding number.

62.     Since Plaintiff was at that time engaged in communications with prestigious institutions such as the Rassias Foundation at Dartmouth College, the University of Milan, Bicocca, Italy, and the Secretary of State in Washington, D.C., these arbitrary and unjustifiable actions on the part of Baruch College irrevocably damaged her relations with these institutions and thereby her professional career.

63.     Before receiving the poor evaluation given to Plaintiff in December 2004, Plaintiff had an accomplished and distinguished twelve-year career at Baruch College and had risen through the ranks to the position of Associate Director of CAPS, receiving immense accolades and praise for the invaluable services she provided to CAPS.

64.     Baruch College/CUNY initiated cosmetic and in some cases significant changes after Ms. Malacarne's constructive criticisms although no credit was ever given to her for her suggestions.  On the contrary, she was dismissed for voicing them.  Baruch College/CUNY

issued new guidelines on sexual harassment in 2005, and found both Mr. Paul Russo and Mr.

Abraham Tawil unworthy of the positions of Dean of CAPS and Vice President of Human

Resources once a national search was launched.  VP Specter was relieved of his responsibility for

CAPS and his authority was reduced.  Daniel Kaufman who had been Vice President of Campus

Facilities and Operations for four years without a college degree was demoted, and efforts were

made to install a woman in each executive position as it was vacated to raise the percentage of

female executives beyond 17% as of June 2004.


65.     Plaintiff was given a poor evaluation and subsequently terminated in retaliation for

pointing out what she honestly believed to be corruption, mismanagement and misuse of public

resources with a view to having the problems remedied for the benefit of Baruch College

students and Baruch as an institution in violation of her right to freedom of expression as

guaranteed to her by the First Amendment which applies to the states through the Fourteenth

Amendment.


66.     Plaintiff was paid less than Paul Russo when they both held similar jobs or jobs

requiring substantially the same skills, ability and efforts because she is a woman in violation of

the Equal Pay Act, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000-e et

seq., the New York State Human Rights Law and the New York City Administrative Code, § 8 et

seq.


67.     Plaintiff was retaliated against because she protested what she believed to be

discrimination in compensation because she is female in violation of the Equal Pay Act, Title VII

of the Civil Rights Act of 1964 as amended, Section 296 of the Executive Law (Human Rights

Law) and the City Administrative Code.

68.     During the course of her employment at CUNY-Baruch College, Plaintiff was

subjected to a hostile work environment on account of her sex by being subjected to unwanted

sexual comments and inquiries, sexually oriented physical contacts and comments, and threats

indicative of the desire to preserve the "old boys network", and to prevent her, a woman, from

fully participating and enjoying the work environment and the harassment continued throughout

the period she was a member of the Executive Committee, and was carried on by, among others,

Paul Russo and Abraham Tawil.

69.     The sexually offensive comments encountered by Plaintiff in the workplace as a

member of the Executive Committee included, but were not limited to: referring to staff

members as "dickheads", saying "suck on this" while holding their crotches, "blow me" while

discussing issues raised at meetings, constant references to women as "broads", and the

use/misuse of the terminology such as "hard one at one o'clock".  Sexual obscenity was common

parlance with Russo and Tawil.  They routinely referred to the President's Counsel as "that

albino dickhead" and commonly identified an HR employee as a lesbian by saying, "she has a

lick-her license".  Obscenities were usually accompanied by lewd gestures, for example Paul

Russo would place his little finger in his crotch to indicate a colleague's lack of masculinity.

70.     Although Plaintiff complained to Defendants and of the Defendants about the offensive language and actions, and sometimes complained in writing, these complaints were ignored and nothing was done and the behavior continued unabated.

71.     The constant and nonchalant use of the sexually inappropriate and harassing words complained of above created an atmosphere where women were deemed not to be worth as much as men both in terms of compensation and in terms of responsibility which led to Plaintiff not even being considered for the positions that opened up in the unit and less qualified men were asked to stay at a premium.

## AS FOR A FIRST CAUSE OF ACTION

72.     Plaintiff realleges and repeats paragraphs 1 through 71 as if each paragraph is recited and repeated verbatim herein.

73.     Plaintiff was subjected to a hostile work environment on account of her female sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

## AS FOR A SECOND CAUSE OF ACTION

74.     Plaintiff repeats and realleges paragraphs 1 through 73 as if each paragraph is repeated and recited verbatim herein.

75.     Plaintiff was subjected to retaliatory hostile work environment for complaining about what she believed to be discriminatory treatment against her on account of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

## AS FOR A THIRD CAUSE OF ACTION

76.     Plaintiff repeats and realleges paragraphs 1 through 75 as if each paragraph is repeated and recited verbatim herein.

77.     Plaintiff was paid less than similarly situated men because she is a woman in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

## AS FOR A FOURTH CAUSE OF ACTION

78.     Plaintiff realleges and repeats paragraphs 1 through 77 as if each paragraph is recited and repeated verbatim herein.

79.     Plaintiff was denied promotional opportunities because she is a woman in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000-e et seq.

## AS FOR A FIFTH CAUSE OF ACTION

80.     Plaintiff repeats and realleges paragraphs 1 through 79 as if each paragraph is repeated and recited verbatim herein.

81.     Plaintiff was subjected to retaliatory poor evaluation and subsequently terminated for protesting what she believed to be discriminatory treatment of her as a female and to other females in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000-e et seq.

## AS FOR A SIXTH CAUSE OF ACTION

82.     Plaintiff repeats and realleges paragraphs 1 through 81 as if each paragraph is repeated and recited verbatim herein.

83.     Plaintiff was subjected to a retaliatory hostile work environment for complaining about what she believed to be corruption, mismanagement and misuse of public resources with a view of getting same rectified in violation of her First Amendment right of Freedom of Expression in violation of  42 U.S.C. § 1983.

## AS FOR A SEVENTH CAUSE OF ACTION

84.     Plaintiff repeats and realleges paragraphs 1 through 83 as if each paragraph is repeated and recited verbatim herein.

85.     Plaintiff was denied promotional opportunities because she expressed her views and complained about what she believed to be corruption, mismanagement and misuse of public resources with a view of getting same rectified in violation of her First Amendment right of Freedom of Expression in violation of  42 U.S.C. § 1983.

## AS FOR AN EIGHTH CAUSE OF ACTION

86.     Plaintiff repeats and realleges paragraphs 1 through 85 as if each paragraph is repeated and recited verbatim herein.


87.     Plaintiff was given a poor evaluation and terminated in retaliation for expressing her views and complaining about what she believed to be corruption, mismanagement and misuse of public resources with a view of getting same rectified in violation of her First Amendment right to Freedom of Expression in violation of 42 U.S.C. § 1983.  In giving Plaintiff a poor evaluation and terminating her employment, the individual Defendants acted under color of State law.


## AS FOR THE NINTH CAUSE OF ACTION

88.     Plaintiff repeats and realleges paragraphs 1 through 87 as if each paragraph is repeated and recited verbatim herein.


89.     Plaintiff was paid less than similarly situated men in two different positions/titles because she is a woman in violation of Equal Pay Act, 29 U.S.C. § 206(d)(1) et seq.


## AS FOR THE TENTH CAUSE OF ACTION

90.     Plaintiff realleges and repeats paragraphs 1 through 89 as if each paragraph is recited and repeated verbatim herein.

91.     Plaintiff was subjected to retaliatory poor evaluation and subsequently terminated for protesting what she believed to be discriminatory treatment of her as a female and to other females in violation of Equal Pay Act, 29 U.S.C. § 206(d)(1) et seq.

## AS FOR THE ELEVENTH CAUSE OF ACTION

92.     Plaintiff repeats and realleges paragraphs 1 through 91 as if each paragraph is repeated and recited verbatim herein.

93.     Plaintiff was paid less than similarly situated men because she is a woman in in violation of the New York State Executive Law § 296 (Human Rights Law).

## AS FOR THE TWELFTH CAUSE OF ACTION

94.     Plaintiff realleges and repeats paragraphs 1 through 93 as if each paragraph is recited and repeated verbatim herein.

95.     Plaintiff was denied promotional opportunities because she is a woman in violation of the New York State Executive Law § 296 (Human Rights Law).

## AS FOR THE THIRTEENTH CAUSE OF ACTION

96.     Plaintiff repeats and realleges paragraphs 1 through 95 as if each paragraph is repeated and recited verbatim herein.

-25-

97.     Plaintiff was subjected to retaliatory poor evaluation and subsequently terminated for protesting what she believed to be discriminatory treatment of her as a female and to other females in violation of the New York State Executive Law § 296 (Human Rights Law).


### AS FOR THE FOURTEENTH CAUSE OF ACTION

98.     Plaintiff realleges and repeats paragraphs 1 through 97 as if each paragraph is recited and repeated verbatim herein.


99.     Plaintiff was subjected to a hostile work environment on account of her female sex in violation of the New York State Executive Law § 296 (Human Rights Law).


### AS FOR THE FIFTEENTH CAUSE OF ACTION

100.    Plaintiff repeats and realleges paragraphs 1 through 99 as if each paragraph is repeated and recited verbatim herein.


101.    Plaintiff was paid less than similarly situated men because she is a woman in violation of  Administrative Code of the City of New York, §§ 8-107.1(a) et seq.


### AS FOR THE SIXTEENTH CAUSE OF ACTION

102.    Plaintiff realleges and repeats paragraphs 1 through 101 as if each paragraph is recited and repeated verbatim herein.

103.    Plaintiff was denied promotional opportunities because she is a woman in violation of  Administrative Code of the City of New York, §§ 8-107.1(a) et seq.


AS FOR THE SEVENTEENTH CAUSE OF ACTION

104.    Plaintiff repeats and realleges paragraphs 1 through 103 as if each paragraph is repeated and recited verbatim herein.


105.    Plaintiff was subjected to retaliatory poor evaluation and subsequently terminated for protesting what she believed to be discriminatory treatment of her as a female and to other females in violation of  Administrative Code of the City of New York, §§ 8-107.1(a) et seq.


AS FOR THE EIGHTEENTH CAUSE OF ACTION

106.    Plaintiff realleges and repeats paragraphs 1 through 105 as if each paragraph is recited and repeated verbatim herein.


107.    Plaintiff was subjected to a hostile work environment on account of her female sex in violation of the Administrative Code of the City of New York, §§ 8-107.1(a) et seq.


108.    Plaintiff suffered serious emotional distress, humiliation, lost wages, professional and career opportunities as a result of the actions of the Defendants complained of herein and has been damaged and will continue to be damaged thereby.

109.     The actions of the individual Defendants complained of herein were callous, reckless and in total violation of Plaintiff's rights and Plaintiff is entitled to punitive damages against the individual Defendants herein.

**WHERFORE,** Plaintiff prays for judgment:

A: Under Title VII of the Civil Rights Act of 1964, as amended, and under the Equal Pay Act as against the City University of New York, only:

I.  awarding Plaintiff damages for emotional and/or psychological injuries she suffered as a result of the sexual harassment she was subjected to at the hands of the individual Defendants in the amount to be proved at trial and in accordance with proof;

ii.  awarding Plaintiff damages for emotional and/or psychological injuries she suffered as a result of the retaliatory hostile work environment she was subjected to by the Defendants for complaining about what she honestly believed to be unlawful sexual harassment that she was being subjected to on account of her sex in the amount to be proved at trial and in accordance with proof;

iii.  enjoining the Defendants from further discriminating and/or retaliating against Plaintiff;

iv.  awarding Plaintiff front and back wages and other monetary benefits she may be shown to have suffered as a result of discrimination and retaliation that she was subjected to, including the difference between the compensation paid to her and the compensation paid to men for performing essentially the same functions, as well as a result of the destruction of her career, in an amount to be proved at trial and in accordance with proof;

v.  awarding Plaintiff reasonable attorneys fees, costs and disbursements of this action;

vi.  awarding such further relief that Plaintiff may be shown entitled to and in accordance with proof.

B: Under First Amendment/42 U.S.C. § 1983 against Paul Russo, VP Specter and the City University of New York:

I.  awarding Plaintiff damages for emotional and/or psychological injuries she suffered as a result of the harassment she was subjected to at the hands of the individual Defendants in the amount to be proved at trial and in accordance with proof;

ii.  awarding Plaintiff damages for emotional and/or  psychological injuries she suffered as a result of the retaliatory hostile work environment she was subjected to by the Defendants for complaining about what she honestly believed to be corruption, misuse of public funds, etc., in the amount to be proved at trial and in accordance with proof;

iii.  enjoining the Defendants from further retaliating against Plaintiff;

iv.  awarding Plaintiff front and back wages and other monetary benefits she may be shown to have suffered as a result of the violation of her right to freedom of expression as enshrined in the First Amendment, as well as a result of the destruction of her career, in an amount to be proved at trial and an in accordance with proof;

v.  awarding Plaintiff reasonable attorneys fees, costs and disbursements of this action;

vi.  awarding such further relief that Plaintiff may be shown entitled to and in accordance with proof.

C: Under the New York State Human Rights Law, as against the City University of New York, Paul Russo and VP Robert Specter, jointly and severally:

I.  awarding Plaintiff damages for emotional and/or psychological injuries she suffered as a result of the sexual harassment she was subjected to at the hands of individual Defendants in the amount to be proved at trial and in accordance with proof;

ii.  awarding Plaintiff damages for emotional and/or psychological injuries she suffered as a result of the retaliatory hostile work environment she was subjected to by the Defendants for complaining about what she honestly believed to be unlawful sexual harassment that she was being subjected to on account of her sex, in the amount to be proved at trial and in accordance with proof;

iii.  enjoining the Defendants from further discriminating and/or retaliating against Plaintiff;

iv.  awarding Plaintiff front and back wages and other monetary benefits she may be shown to have suffered as a result of discrimination and retaliation that she was subjected to, as well as a result of the destruction of her career, in an amount to be proved at trial and in accordance with proof;

v.  awarding Plaintiff costs and disbursements of this action;

vi.  awarding such further relief that Plaintiff may be shown entitled to and in accordance with proof.

D: Under the Administrative Code of the City of New York, § 8 et seq., as against the City University of New York, Paul Russo and VP Robert Specter, jointly and severally:

I.  awarding Plaintiff damages for emotional and/or psychological injuries she suffered as a result of the sexual harassment she was subjected to at the hands of individual Defendants in the amount to be proved at trial and in accordance with proof;

ii.  awarding Plaintiff damages for emotional and/or psychological injuries she suffered as a result of the retaliatory hostile work environment she was subjected to by the Defendants for complaining about what she honestly believed to be unlawful sexual harassment that she was being subjected to on account of her sex, in the amount to be proved at trial and in accordance with proof;

iii.  enjoining the Defendants from further discriminating and/or retaliating against Plaintiff;

iv.  awarding Plaintiff front and back wages and other monetary benefits she may be shown to have suffered as a result of discrimination and retaliation that she was subjected to, as well as a result of the destruction of her career, in an amount to be proved at trial and in accordance with proof;

v.  awarding Plaintiff reasonable attorneys fees, costs and disbursements of this action;

vi. awarding punitive damages against the individual Defendants;

vii.  awarding such other relief that Plaintiff may be seen entitled to and in accordance with proof.


Dated: Brooklyn, New York
         October 25, 2005

OFODILE & ASSOCIATES, P.C.
Attorneys for Augusta Malacarne


By: _____
Anthony C. Ofodile, Esq. (AO-8295)
498 Atlantic Avenue
Brooklyn, New York 11217
718-852-8300